622 So.2d 41 (1993)
Michael McFALL and Katherine McFall, Appellants,
v.
INVERRARY COUNTRY CLUB, INC.; Ben Johnson Cooper; Bruce Remsburg; and Inverrary Association, Inc., Appellees.
No. 91-1822.
District Court of Appeal of Florida, Fourth District.
July 7, 1993.
Rehearing and/or Clarification Denied; Rehearing, Certification and Rehearing Denied August 31, 1993.
*42 John Beranek of Aurell Radey Hinkle Thomas & Beranek, Tallahassee, and Jon E. Krupnick of Krupnick, Campbell, Malone & Roselli, Fort Lauderdale, for appellants.
Robert H. Schwartz of Gunther & Whitaker, P.A., Fort Lauderdale, for appellee Inverrary Country Club, Inc.
G. Bart Billbrough of Walton Lantaff Schroeder & Carson, Miami, for appellee Inverrary Ass'n, Inc.
Rehearing and/or Clarification Denied; Rehearing, Certification and Rehearing En Banc Denied August 31, 1993.
FARMER, Judge.
Inverrary Boulevard is a 4-lane divided roadway, with a landscaped median, that meanders generally north and south through a golf course called Inverrary Country Club. To get to the course itself from the clubhouse, it is necessary to drive a golf cart along a path and across this divided roadway. When the course was originally built in the 1970s, the surrounding area was largely rural with little traffic, so there was little danger in the crossing.
Over the years both the traffic and the vegetation in the median had grown wildly, and eventually approaching roadway traffic was obscured from golf cart drivers by plants bordering the golf course and in the median. After a fatal collision, some plants were removed from the median and *43 a policy of keeping the bordering plants from exceeding a certain height was adopted. But traffic continued to increase and more accidents and "near misses" occurred.
In the middle 1980s, the owner of the golf course sought and obtained permission from county and municipal officials to construct a traffic light at the crossing. The signal was placed over the roadway and directed only toward the traffic proceeding north and south. A stop sign was placed on the golf course at the crossing facing in the direction of approaching golf cart drivers. The idea was that the cart driver could activate the signal by pressing a button on the stop sign. The traffic signal visible to drivers on the roadway would then change to red, and the carts could proceed across the roadway with traffic stopped.
The golf course was later sold to its present owners and by the end of the 1980s different plants were added which newly obstructed the roadway traffic to approaching carts. Moreover, because the stop sign was so situated that mowing equipment could not easily pass, someone had turned the sign so that it now faced in the direction of the roadway, rather than the cart path for which it had been designed and erected.
It was in these circumstances that plaintiff McFall and other graduates from the University of Florida were invited to participate in an alumni golf outing at the golf course. He was not a member of the club, and neither was his golfing partner who drove their golf cart. At the end of play, as they were attempting to return to the clubhouse, they approached the crossing and, seeing a stop sign that appeared to face traffic only on the roadway, proceeded into the intersection. Unfortunately, a vehicle approaching the same intersection on the other side of the median, that McFall and the cart driver say they never saw, collided with their cart, causing McFall to suffer serious injuries.
McFall's suit against the driver of his cart, the owner of the golf course [Club], and the entity that maintained the roadway [Association] went to trial before a jury. He called an expert during his case in chief who testified that the design and maintenance of the crossing with the above circumstances created a dangerous condition that ostensibly led to his injuries. On cross examination by the Club's lawyer, his expert was asked the following:
Q. Is sound a factor that has any significance in the real world of accidents or the prevention or avoidance of accidents?
A. It could, depending on what that sound was, how far away it was, decibel level and so forth.
Q. Things like blowing horns and screeching tires being a sound that might have some impact?
A. It could depending on when it was heard, the loudness of it.
Q. But that's obviously not a factor that you considered?
A. At this point, no sir.
Later in the trial during the Club's case, it called an expert who testified that any approaching traffic on the roadway would have been heard by a cart driver, even if not seen. At the end of the defendants' case, McFall sought to call his expert back as a rebuttal witness to testify on the issue of "sound". The Club objected, saying that the witness had been previously cross examined on that subject during the plaintiff's initial case. McFall's attorney argued that during a pretrial deposition of the defense expert the witness had never addressed the subject whether approaching traffic could have been heard and that the trial testimony had therefore come as a surprise, as to which he now should be allowed to adduce rebuttal evidence. The court excluded the rebuttal evidence, explaining as follows:
THE COURT: So you understand the ruling a little better, if there were an issue that this witness had not had an opportunity to testify about yesterday and the issue was first raised today, then I would say bring him back. * * * What I am saying, your witness already gave his opinion about that yesterday. It is *44 not rebuttal. * * * Here's the point. He asked him about it. If he wanted to give his opinion as to whether sound played a part, you had the opportunity yesterday. I am not going to allow it.
During the trial, the court also precluded plaintiffs from introducing evidence of numerous other accidents and near misses at the crossing, as well as evidence as to whether the stop sign complied with section 316.0747, Florida Statutes (1989). The jury returned a verdict in favor of the Club and the Association, and found the driver of the golf cart 100% responsible for the accident. McFall's post trial motions renewing the above evidentiary questions were denied. He and his wife appeal. We reverse for a new trial.
McFall argues that the exclusion of his rebuttal expert's testimony was an abuse of discretion. He points out that the proposed testimony was not in any sense cumulative and that he had no obligation during his case in chief to offer evidence to disprove a defendant's theory of the case. Even if he had such an obligation, he further argues that here the defense witness never identified the theory used at trial during the pretrial deposition. Hence, he contends, even if a plaintiff must address possible defense theories during plaintiff's initial case, here he was prevented from doing so by the failure of the defense witness to disclose all of his theories and opinions in discovery.
We agree with McFall that this case is indistinguishable from our recent decision in Heberling v. Fleisher, 563 So.2d 1086 (Fla. 4th DCA), rev. dismissed, 570 So.2d 1305 (Fla. 1990). In that case, plaintiff's expert had testified that negligent diagnosis or treatment by defendants was the cause of decedent's death. Defendants' experts later testified that irreversible brain damage had actually caused the death. Plaintiff then sought to call a neurosurgeon on rebuttal who would have disputed the brain damage theory. The trial court refused to allow the rebuttal witness because his testimony would have been cumulative and should have been presented during plaintiff's case.
In reversing for a new trial, we specifically held both that the evidence was not cumulative and that plaintiff had no obligation to present that evidence during the initial case. Writing for our court, Judge Letts explained:
"[W]e do not believe that this general rule [trial court has discretion to admit or exclude rebuttal evidence] stands for the proposition that the plaintiff must disprove all anticipated defenses in its main case  that is exactly what rebuttal is supposed to accomplish. * * * In the case at bar, the plaintiff had to meet the initial burden of proof to establish negligent diagnosis or treatment on the part of the defendants. Unarguably, it did that much. The defense posture that in actuality the deceased died from brain injuries suffered in the crash was entirely proper, but we agree that the plaintiff had a right to attempt to rebut it and present evidence that the brain injury was not the cause of death. * * * The rebuttal evidence sub judice was not cumulative, since no evidence of its subject matter had been offered by the plaintiff prior to the presentation by the defense of the brain damage theory." [e.o.]
563 So.2d at 1087. He went on to note that there was a serious question during pretrial discovery and preparation as to whether the brain damage evidence was even admissible and that plaintiff could hardly be fairly expected to introduce evidence on a subject that he contended was inadmissible.
This holding surely governs the present case. Even if McFall's lawyers had actually known before trial that the defense expert might testify that the golf cart driver could have heard the oncoming traffic and was thus negligent in failing to stop at the crossing, we do not believe that McFall had the burden of addressing that subject during his own case. That subject was not necessary to the construction of a prima facie case of liability against the Club and Association. It dealt instead merely with a possible defense that might never be presented for all he knew.
*45 McFall's theory of liability lay in the design of the crossing, the negligent maintenance of the vegetation and plants, and the misplacement of an improper stop sign. As he points out in his post trial motions, even if the cart driver were found negligent to some degree, if the Club were also negligent to some degree, he could then satisfy a judgment against any of the defendants liable under this statutory joint and several liability case.[1] The issue of sound went, as he contends, primarily to the liability of the Club and Association. Hence the exclusion caused real prejudice, and he is entitled to a new trial.
As a new trial is necessary, we comment also on the other contentions relating to the exclusion of evidence. The court excluded testimony about near misses at the crossing from a police officer who had investigated accidents at the location. The basis for the exclusion was that the officer had not reported the near misses to either the Club or Association, who thus lacked notice of them. We are unable to agree that the court's reason justified the exclusion. While plaintiffs had the burden of showing that the Club and Association knew that a dangerous condition existed, that burden does not mean that this evidence was inadmissible. The near misses surely were relevant to the issue whether the dangerous condition actually existed.
Under section 90.107, Florida Statutes (1991), evidence that is admissible to show one discrete issue is not totally inadmissible simply because it is not admissible on another issue. The disputed evidence tended to prove whether the crossing was dangerous in light of the existing circumstances. A separate issue was whether defendants had notice of the dangerous condition. The evidence could have been admitted subject to a limiting instruction that plaintiffs had the separate burden of showing notice of the dangerous condition.
Also admissible was the evidence relating to compliance with section 316.0747(1).[2] That provision, generally speaking, requires that traffic control devices used "at any place where the general public is invited" conform to Department of Transportation [DOT] regulations. At the same time, section 316.212, Florida Statutes (1989), further provides that golf carts may not cross certain public roadways unless DOT reviews and approves the design of the crossing and any traffic control devices needed for safety purposes. The judge excluded proposed evidence that the stop sign did not conform to the uniform system. He reasoned that the area was not a "location" at which the general public is invited.
Although the tournament was aimed at graduates and students of the University of Florida, it was a charitable function and was actually open to anyone willing to pay the fee and fill out the entry form. It thus appears that on this occasion members of the general public had been allowed to enter the tournament and use the golf course. Giving the statutory language "at any place where the general public is invited" [e.s.] its ordinary meaning, we think that the statutory requirement had been met and the crossing was such a place.
The place in question is not simply that narrow plot of earth on which the stop sign itself sat, but the general place at which  as opposed to on which  it was being used. That place was at the transection of the cart path by Inverrary Boulevard. That is at the union of private and public property  not, e.g., at a crossroads wholly within the private parking lot inside the club property where a plausible contention might be *46 made that at certain times the general public was not invited.
The record before us shows without contradiction that the crossing here was thus a place at which the general public is invited. Of course at any retrial, if there is contradictory evidence on the point, the court might justifiably admit this evidence subject to a proper limiting instruction, requiring the jury to determine factually whether the place in question is one "at which the general public is invited" as a prerequisite to addressing whether the stop sign complied with DOT regulations.
REVERSED AND REMANDED FOR NEW TRIAL.
DELL, C.J., concurs.
ANSTEAD, J., concurring specially with opinion.
ANSTEAD, Judge, concurring in part; dissenting in part.
I agree with the majority opinion except as to the issue of the trial court's exclusion of a police officer's comments about prior "near misses" in the area where the accident took place.
The officer could offer no specifics about the "near misses" and he was uncertain about the number, first saying there were several, and then estimating between eight to fifteen over a two and one-half year period. A jury would be left to speculate about the circumstances of these "non-accidents" and as to whether any of the factors present in the instant case were also factors in those cases, where, of course, no accident took place. A close call to some might be a cautious passing to others. Unlike prior accidents which actually took place, there is nothing objective or certain about opinions and estimates of "near misses" and their causes. I find no error by the trial court in excluding this testimony.
NOTES
[1] See § 768.81(3), Fla. Stat. (1991). The jury ascribed no negligence to the plaintiff, so as plaintiff argues even if the Club and Association were found only 1% negligent, he could still have sought recovery from them for all of his damages. This jury was not asked to assess damages.
[2] That provision reads:

"It is unlawful for any nongovernmental entity to use any traffic control device at any place where the general public is invited, unless such device conforms to the uniform system of traffic control devices adopted by the Department of Transportation pursuant to this chapter."